F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**JUN 6 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BARLOW & HAUN, INC.,

      Plaintiff-Appellant,

v.

LARRY A. MCPEEK; L.A. MCPEEK
& CO., a partnership; M. RAY
THOMASSON; THOMASSON
PARTNER ASSOCIATES ROYALTY
POOL, LTD.; THOMASSON
PARTNER ASSOCIATES, INC.;
GEORGE E. NEWMAN; and G.E.
NEWMAN & COMPANY,

      Defendants-Appellees.

No. 99-8058
(D.C. No. 98 CV 1041-B)
(District of Wyoming)

**ORDER AND JUDGMENT***

Before **SEYMOUR**, Chief Judge, **EBEL**, and **HENRY**, Circuit Judges.

      Plaintiff-Appellant Barlow & Haun, Inc. ("B&H") brought claims of breach

of contract, breach of assigned and assumed contract, breach of fiduciary duty,

conversion, accounting, constructive trust, intentional interference with a

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

contractual relationship, and unjust enrichment against Larry A. McPeek

("McPeek"), L.A. McPeek & Co., Ray Thomasson, Thomasson Partner Associates

Royalty Pool, Ltd., Thomasson Partner Associates, Inc. ("TPA"), George E.

Newman, and G.E. Newman & Co. (collectively, "Defendants"). The parties filed

cross motions for summary judgment. In an order dated May 28, 1999, the

district court denied B&H's motion for summary judgment and granted summary

judgment for Defendants on all of B&H's claims. B&H now appeals from that

order. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm for

substantially the same reasons stated in the district court's order.

## BACKGROUND[1]

A. Parties

B&H is a geological consulting firm that has its principal place of business

in Casper, Wyoming. James Barlow owns 100% of the B&H shares.

Larry A. McPeek is a geologist working and residing in Colorado. He

worked with B&H from 1972 to 1986 and subsequently became associated with

TPA. L.A. McPeek & Co. is a Colorado partnership that was formed by McPeek

and his wife.

---

[1]We adopt the district court's rendition of the facts as set forth in its
unpublished order, and we repeat the relevant parts here. See Barlow & Haun,
Inc. v. McPeek, No. 98-CV-1041-B (D. Wyo. May 28, 1999), Aplt. App. at 59-84.

Ray Thomasson formed and is president of TPA, a Colorado corporation. Thomasson Partner Associates Royalty Pool, Ltd. is a Colorado limited partnership formed for the purpose of enabling the professionals brought together by TPA to share in the royalties in each other's projects.

George E. Newman, a/k/a G.E. Newman & Co. is a petroleum engineer and an associate of TPA. Newman worked with McPeek and Thomasson in 1993 on the development of the Waltman-Cooper Reservoir Project ("Waltman-Cooper"). Waltman-Cooper lies in the Wind River basin of western Natrona County, Wyoming.

B. Chronology of Events

In 1970, McPeek worked for Koch Exploration Company ("Koch"). While working at Koch, McPeek recommended drilling a well in the Waltman-Cooper Reservoir Area in Wyoming. He based this recommendation on geological prospects that he developed to show the potential of the North Waltman area as a prospective oil and gas field. Koch did not drill the well, and has never made a claim to this geologic prospect.

In 1972, McPeek began working with B&H. The agreement entered into by McPeek and B&H was solidified by a September 1, 1972 letter from B&H to McPeek that stated in part:

1.) You are not an employee of B&H, however, you will spend all of your professional geological time working for B&H but as your own agent.

2.) B&H will pay you a consulting fee of $1,000.00 per month for twelve months, and an office allowance of $500.00 per month.

3.) You will work on the B&H-Coors Denver Basin gas project approximately one-half time and you will develop oil and gas exploration ideas and prospects during the other half of your time.

4.) B&H will reimburse you for out-of pocket expenses you may incur on behalf of any client but you will be responsible for any other office or prospect development costs. . . .

5.) You will submit your exploration ideas and prospects to B&H and if B&H so elects we will provide you the funds for land acquisition or whatever is necessary to make use of the idea. If B&H is not interested in your idea or prospect you can do with it as you see fit.

6.) When one of your ideas or prospects, in which B&H has acquired an interest, is sold or turned to a third party, you shall receive 20% of the net cash and 20% of the interest retained by B&H. . . .

[T]his letter can probably serve as our understanding which I hope will be the basis for a pleasant and profitable venture.

The agreement was signed by McPeek and Jim Barlow of B&H, and was only altered slightly during McPeek and B&H's fourteen-year relationship.

In 1973, McPeek submitted a proposal for the Waltman-Cooper prospect to B&H. The recommendation made in McPeek's proposal to B&H was very similar to the recommendation McPeek had previously made to Koch. After receiving McPeek's proposal, B&H devoted some resources to this prospect, and in 1974,

B&H and McPeek submitted a study, the "Geologic Report Waltman-Cooper Reservoir Area," to the Kansas-Nebraska Natural Gas Company ("KN"), with the intent that KN would bid for and acquire the federal oil and gas leases in the area. This proposal contained structure maps, isopach maps, and cross-sections identifying and explaining the geological trap in the Waltman-Cooper Reservoir Area. These documents contained the B&H logo. KN accepted the proposal with a three-year area of mutual interest ("AMI").[2] Before the prospect could be tested, however, KN needed to acquire the key leases identified in the proposal. KN was unsuccessful in acquiring these leases. Phillips Petroleum outbid KN, and, in March 1975, Phillips Petroleum acquired the key leases. Phillips did not develop the key leases, and neither KN nor B&H (nor McPeek prior to 1993) attempted to contact Phillips concerning these leases.

B&H did acquire some additional leases in the Greater Waltman area. These were assigned to KN with a retained override in B&H. McPeek received his interest in these leases in accordance with the agreement he had with B&H. In a December 22, 1975 letter from McPeek to Jim Barlow, McPeek listed overriding royalty and working interests that B&H owed him. Among these were: "Twenty percent of the overriding royalty owned by B&H in the Waltman area.

_____

[2]An AMI is a delineated area in which parties agree to acquire interests for their mutual benefit in pursuit of a prospect during a specified time.

Most of this has been previously assigned to me . . . but more recently acquired leases have not." In an April 26, 1977 letter from McPeek to Barlow, McPeek advised B&H of their various obligations to one another. This included: "Greater Waltman Area: Twenty per cent of any ORR owned by B&H which has not previously been assigned to me." McPeek sent another letter to B&H that contained the same language on June 2, 1977.

McPeek and B&H decided to end their association in 1986. The Termination Agreement signed by Barlow and McPeek stated in relevant part:

> All things considered I [,McPeek,] believe it would be best if we terminated our business association. I have reached this conclusion reluctantly as we have shared many good years and projects, but I do not feel that I can continue with any enthusiasm. So that we may have an orderly disengagement I will continue with those projects on a day to day basis which are currently underway and for which I have had primary responsibility, provided of course that you want me to do so. I do feel that Barlow & Haun, Inc. and I have some obligations toward one another and shall attempt to enumerate them in the remainder of this letter.
>
> [Lists Several Projects]
>
> To the best of my knowledge this constitutes all of the remaining obligations we have to one another that haven't previously been committed to paper. I would appreciate it if you would acknowledge them by signing in the space provided below and returning this letter to me.

The letter was signed by both parties after Barlow had an opportunity to review it and make changes.

McPeek subsequently became associated with TPA. In 1993, Thomasson asked McPeek for recommendations of natural gas prospects. McPeek reviewed his prior geological concepts and undeveloped prospects, including the Waltman-Cooper prospect. McPeek and Newman reworked the well-spacing and generated a larger reserve estimate. McPeek determined that the Waltman-Cooper prospect contained many small discontinuous reservoirs of gas rather than large reservoirs, and this increased the attractiveness of the Waltman-Cooper prospect because the total amount of gas projected to be available increased. McPeek then updated the data used to outline the prospect's potential.

Newman, Thomasson, and McPeek discovered that the Phillips leases were about to expire because of lack of development. Thomasson negotiated the Phillips leases in December 1993, and acquired them on behalf of TPA. During this time, TPA and McPeek made a presentation to Barrett Resources Corporation ("Barrett") regarding the proposed prospect. Included in the presentation were structure maps very similar to the B&H maps supplied to the KN Prospect, and documents that contained the B&H logo. The prospect proposed by McPeek/TPA to Barrett was similar to the prospect proposed to KN by B&H. TPA then sold the leases to Barrett with the agreement that Barrett would drill a test well in the Waltman-Cooper area. If the well was successful, McPeek, Newman, and Thomasson would receive an overriding royalty interest in the well and in any

subsequent wells drilled in the area on leases acquired by Barrett within a three-year period. In 1994, the well drilled by Barrett on the Phillips leases was very successful.

DISCUSSION

We review a grant of summary judgment de novo. We first consider if there is a genuine issue of material fact in dispute; if not, we then determine if the district court correctly applied the substantive law. See Sequoyah County Rural Water District No. 7 v. Town of Muldrow, 191 F.3d 1192, 1196 (10th Cir. 1999).

Although B&H argues that the district court improperly decided disputed factual issues, it failed to set forth in the district court or in its opening brief to this court any material issues of fact that are in dispute. We agree with the district court that there are no disputed issues of material fact, and thus our task on appeal is to determine if the district court correctly applied the substantive law.

B&H did not properly raise the issues of partnership and breach of fiduciary duty in this appeal. The issues were not mentioned in B&H's opening brief; therefore, any challenge to the district court's rulings on those issues is deemed waived. See State Farm Fire & Casualty Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (citation omitted).

With respect to its breach of contract claim, B&H appeals the district court's determination that B&H did not acquire an interest in the entire Waltman-Cooper Reservoir Prospect when KN accepted the prospect in 1974. When no material facts are in dispute, summary judgment is proper on a breach of contract claim if the contract is found to be unambiguous. See Martin v. Farmers Ins. Exch., 894 P.2d 618, 620 (Wyo. 1995). "Ambiguity exists where a contract is obscure in its meaning because of indefiniteness of expression or because it contains a double meaning." Id. (citation omitted). In interpreting a contract, a court must consider it as a whole, reading each provision in light of the others. See id.

We agree with the district court that the 1972 agreement between B&H and McPeek was unambiguous. See Barlow & Haun, No. 98-CV-1041-B, Aplt. App. at 74. Reading paragraphs five and six of the agreement together, to "acquire an interest" in one of McPeek's ideas or prospects, B&H had to either provide the funds for land acquisition or take whatever action was necessary to make use of the idea. B&H's failure to obtain the key leases and failure to discuss the matter further after that point meant that it failed in doing "whatever was necessary to make use of the idea" as it concerned the area in which the key leases were located. B&H therefore failed to acquire an interest in that area and cannot sustain a breach of contract action against McPeek regarding that area.

We also agree with the district court that even if there was ambiguity in the contract between B&H and McPeek on the issue of how B&H would "acquire an interest" in one of McPeek's ideas or prospects, the 1986 termination agreement between B&H and McPeek unambiguously terminated any possible interest B&H could have acquired in the area in which the key leases were located. See Barlow & Haun, No. 98-CV-1041-B, Aplt. App. at 75. The termination agreement, which was signed by both parties, listed outstanding obligations the parties had to each other and then stated, "To the best of my knowledge, this constitutes all of the obligations which we have to one another that haven't previously been committed to paper." None of the listed obligations pertained to the area in which the key leases were located, and an obligation with respect to that area was not previously committed to paper. The documents to which B&H points to support its argument that such an obligation was previously committed to paper prove unavailing. The letters referenced by B&H explicitly refer either to royalties owed to McPeek from *acquired* leases or from overriding royalties actually *owned* by B&H. The leases relevant to this lawsuit were not acquired, and B&H could therefore not have owned any royalties from those leases. The geologic report submitted to KN and B&H's agreement with KN also fail to support B&H's argument. The geologic report merely describes drilling objectives to help achieve McPeek's suggestions for the area. The agreement between B&H and KN explicitly states

- 10 -

that KN's obligations to drill were contingent on it being successful in acquiring a satisfactory acreage position within the North Waltman area, and that B&H was entitled to an overriding royalty on any acreage actually *acquired* by KN. This is not sufficient to constitute a written obligation concerning the area in which the key *unacquired* leases were located.

Because there is no evidence of an obligation between B&H and McPeek concerning the area in which the key leases were located, B&H cannot sustain its breach of contract action against McPeek. We therefore affirm the district court's order granting summary judgment against B&H on that claim.

B&H acknowledges that if we affirm the district court's holding that B&H has no interest in the area in question, every one of its alternative theories of recovery, except conversion, must fail. Having found that B&H did not acquire an interest in the relevant area, we affirm summary judgment against B&H on those alternative theories of recovery.

B&H's final argument on appeal is that the district court erred in granting summary judgment on its conversion claim. B&H specifically faults the district court's finding that McPeek could do whatever he wanted with the prospect information and maps in his possession that were not available to the public. We find no fault with the district court's ruling on this issue. First, although the maps used in developing the B&H prospect bore the B&H logo, B&H

acknowledges that the Waltman-Cooper Reservoir prospect was created from ideas and work jointly developed by McPeek and B&H. Much of the work is in fact traceable back to McPeek's time with Koch Exploration Company and was not confidential or secret information. Second, the agreement between B&H and McPeek provided that if B&H had no interest in McPeek's idea or prospect, McPeek could "do with it as [he saw] fit." Having found that B&H did not have an interest in McPeek's idea because it failed to take the necessary steps to acquire an interest, we agree with the district court that "the prospect was McPeek's to do with as he so chose." Therefore, summary judgment was also proper on B&H's conversion claim.

## CONCLUSION

After a de novo review of the parties' briefs and arguments, the district court's order, and the entire record, we affirm for substantially the same reasons set forth in the district court's Order Granting the Motion for Summary Judgment.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge